JAJ:SDD

**M11-1043**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      -against-

RICHARD PHILLIPS,

          Defendant.

- - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF ARREST WARRANT

(T. 50, U.S.C., § 1705,
et. seq.; 18, U.S.C.,
§ 2)

EASTERN DISTRICT OF NEW YORK, SS:

      ASHLEY E. SCHRANK, being duly sworn, deposes and says

that she is a Special Agent with Homeland Security Investigations

("HSI"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between

October 5, 2011 and October 21, 2011, within the Eastern District

of New York and elsewhere, the defendant RICHARD PHILLIPS,

together with others, did knowingly, intentionally and willfully

attempt to export, re-export, sell and supply, from the United

States to Iran goods, to wit, a spool of Toray T800SC-12K-50C

carbon fiber, without first obtaining the required export license

from the Office of Foreign Assets Control ("OFAC"), in violation

of Title 50, United States Code, Sections 1702 and 1705; Title

31, Code of Federal Regulations, Sections 560.203 and 560.204,

560.206 and 560.701; and Title 18, United States Code, Sections 2 and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.    I am currently a Special Agent with HSI, and have served in this capacity since March 2009.  I am currently assigned to the Counter-Proliferation Investigations group.  My duties include the enforcement of federal laws involving the export of U.S.-origin commodities to embargoed countries.

2.    As a Special Agent of HSI, I have received advanced training in Counter-Proliferation Investigations at the Federal Law Enforcement Training Center, including the scope and application of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, and the Iranian Transactions Regulations ("ITR"), 31 C.F.R. §§ 560.203 and 560.204.  I have conducted and participated in several investigations of the above listed laws and regulations.

3.    Through my training, education, and experience - which has included (i) debriefing cooperating witnesses concerning violations of federal export laws, financial reporting

---

[1]    Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest, I have not set forth every fact learned during the course of this investigation.

regulations, and laundering the proceeds of criminal activities; (ii) reviewing financial records that reflect the structuring of deposits and withdrawals; (iii) conducting surveillance of individuals engaged in the violation of federal law; and (iv) executing search warrants on suspect premises - I have become familiar with the manner in which commodities are exported from the United States directly or indirectly to embargoed companies, such as Iran, to avoid both reporting requirements and detection by law enforcement.

4.      I have personally participated in this investigation and have witnessed some of the facts and circumstances described herein.  In addition, I have received information from other federal law enforcement officials.  I also have reviewed documents obtained during the course of the investigation.  The statements contained in this affidavit are based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel.

5.      This affidavit is in support of a criminal complaint charging that the defendant RICHARD PHILLIPS has violated IEEPA (50 U.S.C. §§ 1701-1706) by attempting to export carbon fiber from the United States to Iran without first obtaining the necessary export license.

3

## EXPORT CONTROL LAWS AND REGULATIONS

6.     Pursuant to the authority under IEEPA, the President of the United States and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods. Prior to October 15, 2007, Title 50, United States Code, Section 1705 provided that:

> Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined . . . , or, if a natural person, may be imprisoned for not more than twenty years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

7.     On October 15, 2007, IEEPA was amended to include a conspiracy provision and an increased fine.  Section 1705 now provides:

> A person who willfully violates, willfully attempts, or willfully conspires to violate, or causes a violation of any license, order, or regulation issued under this chapter shall, upon conviction, be fined more than $1,000,000 , or, if a natural person, may be imprisoned for not more than twenty years, or both.

8.     Pursuant to an Executive Order by President William Jefferson Clinton in 1995, the Secretary of the United States Department of Treasury, in consultation with the Secretary

4

of State, promulgated the ITR.   The ITR generally prohibit any

person from exporting or causing to be exported from the United

States without a license any good or technology without having

first obtained a validated export license from OFAC.

9.   The ITR imposed, among others, the following

prohibitions:

> Section 560.203 - Prohibition of any
> Transaction to Evade or Avoid the Embargo and
> any Attempt to Violate the Embargo:
>
> Any transaction by any United States person
> or within the United States that evades or
> avoids, or has the purpose of evading or
> avoiding, or attempts to violate, any of the
> prohibitions contained in this part is hereby
> prohibited.
>
> Section 560.204 - Prohibition of any Sale or
> Supply of any Goods, Technology, Services to
> Iran or the Iranian Government:
>
> Except as otherwise authorized [by a license
> issued by OFAC], the exportation, . . . sale,
> or supply, directly or indirectly, from the
> United States, or by a United States person,
> wherever located, of any goods, technology,
> or services to Iran or the Government of Iran
> is prohibited, including the exportation, . .
> . sale, or supply of any goods, technology,
> or services to a person in a third country
> undertaken with knowledge or reason to know
> that:
>
> (a)   Such goods, technology, or services are
> intended specifically for supply . . .
> directly or indirectly, to Iran or the
> Government of Iran . . .

10. It is my experience, and the experience of law enforcement officers with whom I work, that individuals and companies attempting to circumvent the current U.S. sanctions with Iran will export goods from the United States to transshipping companies located in non-embargoed companies, such as the Philippines, for transshipment to end-users in Iran.

## FACTUAL BASIS FOR PROBABLE CAUSE

11. On or about September 30, 2011, an HSI undercover agent ("UC") placed an advertisement on a public website, seeking the assistance of an "export specialist" in shipping goods to Tehran, Iran. The advertisement expressly stated that "[w]e cannot do it ourselves because of [sic] the embargo on Iran in the US makes it against the law for anyone to send stuff to Iran without a license." The advertisement provided the UC's contact information.

12. On October 5, 2011, the defendant RICHARD PHILLIPS responded to the UC advertisement via email. In the email, the defendant indicated that he "maybe able to help," and provided his cellular telephone number.

13. Over the next few weeks, the UC and the defendant RICHARD PHILLIPS engaged in a series of telephone calls, which were recorded by HSI. During these phone calls, the UC and the defendant engaged in detailed conversations regarding a proposed

shipment of one spool of Toray carbon fiber to Iran.  During the
first recorded call on October 5, 2011, the UC explained to the
defendant that he needed assistance because he had a package
turned around from Iran due to export regulations, and therefore
needed someone who could offer expertise in shipping goods to
Iran.  When the defendant asked, "isn't this technically illegal
because of the embargo?" the UC replied, "not 'technically,' it
is illegal . . .  I don't want to mislead anyone, it is.  I tried
to get the license from the Treasury Department to send it there,
and they said no."  The defendant then explained that he had
contacts to whom he could send the package, and then forward it
to "Iran or Iraq or wherever it's going."  The UC clarified that
the goods were going to Iran, and further explained that he was
in the business of selling "carbon fiber, electronics and plane
parts."

14.  Based on my training and experience, I know that
carbon fiber is a commodity, subject to U.S. government license
regulations, which has both military and non military uses.
Carbon fiber composites are ideally suited to applications where
strength, stiffness, lower weight, and outstanding fatigue
characteristics are critical requirements.  These composites also
can be used in applications where high temperature, chemical
inertness and high damping are important.  The two main

applications of carbon fiber are in specialized technology, which includes aerospace and nuclear engineering, and in general engineering and transportation, which includes engineering components such as bearings, gears, cams, fan blades and automobile bodies. In addition, certain carbon fiber based composites are used in military aircraft.

15. On October 11, 2011, the defendant met with the UC in person to further discuss the means and cost of shipping the carbon fiber to Iran. At that time, the UC showed the defendant a spool of carbon fiber, and the two discussed shipping costs for exporting the item to Iran. In a conversation recorded by HSI during the meeting between the defendant RICHARD PHILLIPS and the UC, the defendant indicated that the cost of shipping goods to Iraq was $550, plus duties, which he estimated would be similar to the cost of shipping items to Iran because it was a similar distance. The UC further stated that he had a trusted contact in the Philippines who could assist with the shipment, and that by December 15, 2011, he himself would be in the Philippines in person to continue business dealings. The defendant further indicated that he was familiar with shipping rules and regulations, because he had shipped to other areas of the world, such as Japan, in the past. When the defendant stated that he didn't mind "working in the grey areas," but didn't want to do

8

anything "totally illegal," the UC stated, "I don't want to scare you, but what we are doing is totally . . . illegal." Later in the conversation, the defendant remarked, "I know what the rules are . . . I know what the grey area is . . . I could give a f--k about what they say about what we can ship somewhere else."

16.   In addition, on October 13, 2011, in a recorded telephone conversation, the defendant stated to the UC that he had an account with a courier service that could be used to export the carbon fiber.  The defendant and the UC then arranged a second meeting with the UC, for the purpose of the UC providing the defendant with the carbon fiber so that the defendant could affix a shipping label on the package to his contact in the Philippines, and then deliver the carbon fiber to the courier service for export.

17.   With respect to the defendant's ultimate compensation for his role in shipping the spool of carbon fiber, on October 13, 2011, in a recorded telephone call, the defendant and the UC continued to discuss the terms of the export deal. The defendant stated that he was agreeable to shipping the goods, "as long as you can swear on your wife's life that you are not setting me up for a fall with the federal government."  The defendant negotiated a payment arrangement for the export of the carbon fiber, by which the defendant would be compensated with a

33 percent share of the profits once the spool of carbon fiber had been sold in Iran.  The UC estimated that the carbon fiber would sell for approximately $3000 per spool, of which the defendant would receive a portion after the sale.  The UC and the defendant also discussed shipping additional spools in the future.   The defendant also stated that, "by December, I plan on having an office in the Philippines."

18.  On October 16, 2011, the defendant RICHARD PHILLIPS sent the UC an email, providing information relating to his associate's bank account in the Philippines for the purpose of the UC sending approximately $120 USD to cover the associate's expenses for traveling to the freight shipment company office to make arrangements for the spool of carbon fiber to be forwarded to Tehran, Iran once the associate had received it from the United States.

19.  On October 17, 2011, the defendant RICHARD PHILLIPS sent another email to the UC, supplying the name of his business in South Ozone Park, New York.  The UC and the defendant had discussed that the name of the defendant's business would be used on the invoice for the defendant's receipt of the goods from the UC, to insulate the UC from liability for shipping the goods to Iran.  In addition, in the email, the defendant also provided the name of a shipping company.

10

20.  On October 21, 2011, the defendant RICHARD
PHILLIPS met the UC in Brooklyn, New York.  The UC provided the
defendant with a spool of carbon fiber, which was placed into a
shipping container.  The defendant affixed a label to the
container, addressed to the Philippines.  The UC and the
defendant then waited for the arrival of the courier service.

21.  A search of records conducted by the Office of
Foreign Assets Control and the U.S. Department of Commerce has
revealed that the defendant RICHARD PHILLIPS does not possess a
license to export goods to Iran, or to the Philippines.

WHEREFORE, your deponent respectfully requests that an
arrest warrant be issued, and that the defendant RICHARD PHILLIPS

11

be dealt with according to law.   Because of the risk of flight
and destruction of evidence, your deponent further requests that
this application be filed under seal.

_____
ASHLEY E. SCHRANK
Special Agent, HSI

Sworn to before me this
October 21th 2011


_____
HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

12